UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
UNITED STATES OF AMERICA,

                     - v -

LUIS MATTA,

                     Defendant.
------------------------------------------------------------x

**REPORT AND RECOMMENDATION**

CR-07-459 (DLI)(VVP)

The government has charged the defendant Luis Matta with three violations of the conditions of supervised release that were imposed on him following his conviction as a felon in possession of a firearm. Two of the charges – the commission of two crimes in violation of state law – arise from an incident in which Matta was accused of striking Shavon Coakley, the mother of his daughter, leading to his arrest on charges of assault and menacing. The third charge, use of a controlled substance, arises from Matta's consumption of cocaine while incarcerated at Riker's Island following his arrest on the assault and menacing charges. Judge Irizarry has referred the matter to me to conduct a hearing and prepare a report and recommendation concerning the charges.

An evidentiary hearing concerning the charges was held on November 13, 2012 at which Coakley testified, as well as two New York City police officers – Stanislov Yakovlev and Kenneth Wieber – and United States Probation Officer Yara Suarez. Based on their testimony, and the other evidence introduced at the hearing, I make the findings and reach the conclusions below.

*Charges One and Two: Commission of the Crimes of Assault and Menacing*

At approximately 10:00 p.m. in the evening of August 25, 2012, shortly after Coakley arrived at a birthday party to pick up their child, Matta struck Coakley repeatedly with such force that he broke her jaw. Coakley did not seek medical attention immediately, however. Rather, the following day she was driven to Beth Israel Hospital – Kings Highway Division in Brooklyn by a male friend named Jason, where X-rays confirmed her injury, GX 2, Page 5 of 12, and she received treatment, GX 2 *passim*.[1] Hospital records disclose that when questioned by medical personnel concerning her injury, she initially declined to elaborate because she did not want the police involved, but ultimately disclosed that she had been struck by the father of her daughter. GX 2, Pages 1, 2, 6 and 8 of 12; Tr. 66-70. As a result, hospital personnel contacted the police, and patrol officer Stanislov Yakovlev and his partner went to the hospital to question Coakley about the incident. Tr. 8-9.

When Yakovlev arrived he found Coakley on a bed in the emergency room, accompanied by her friend Jason. He observed that Coakley had redness on her left cheek and on her neck. Tr. 10-11. She disclosed to him that when she went to pick up her child from the father, Luis Matta, on the previous evening, a verbal altercation ensued and that Matta eventually grabbed her by the neck and punched her several times in the face. Tr. 12.[2]

---

[1] "GX" refers to the government's exhibits received in evidence at the hearing; "Tr." refers to the transcript of the hearing.

[2] In closing argument, defense counsel suggested that during Officer Yakovlev's interview of Coakley, it was actually her friend Jason who provided the information concerning Matta's involvement in the assault. Although Yakovlev concurred that Jason had provided some general information, he also was unequivocal that it was Coakley who provided details and who told him that it was Matta who struck her. Tr. 21-22.

Coakley provided Yakovlev with the father's name, address and date of birth which were recorded on a piece of scratch paper from Yakovlev's notebook. GX 1; Tr. 15-16. She also provided her own name, address and date of birth on the paper, as well as the name of her and Matta's child. *Id.* In addition, Coakley wrote out and signed a statement concerning the assault in which she confirmed what she had told Yakovlev about the events of the previous evening. GX 7; Tr. 12-14, 47.

A month later, on September 24, 2012, Matta was arrested by Detective Investigator Kenneth Wieber of the New York Police Department. Upon being told that he was being charged with an assault on Coakley, Matta told Wieber he did not understand why she was making such an allegation. Matta said Coakley had told him that she had been injured at Cooper Park; that she had been drinking; that she stepped out of the park and was on the sidewalk when someone ran by and bumped into her, causing her to fall. Tr. 27-28. Matta wrote and signed a statement which confirm the oral statements he made to Wieber. GX 3500-KW-5.

Wieber then called Coakley, to whom he had not spoken before. When told that Matta had just been arrested for assaulting her in August, she became annoyed and told Wieber that her prior statement that Matta had punched her was wrong. Tr. 29-30, 35. She attributed her prior statement inculpating Matta to being "drugged up" in the hospital. Tr. 30. Instead, she provided Wieber with essentially the same explanation about an accidental bump precipitating a fall that Matta had just given. *Id.*

When informed of Matta's arrest, the United States Probation Officer who had recently been assigned to supervise him, Yara Suarez, began her own investigation. She spoke to Coakley on September 26, 2012, two days after Wieber had spoken to her. In the interim, Coakley's story had changed yet again. She told Suarez that her jaw was broken when she was jumped from behind and robbed on the evening of August 25. She told Suarez that she was on her way to a cookout that Matta and her daughter were attending when the robbery occurred, that she had been punched in the face, and that her pocketbook had been stolen. Tr. 62.

Coakley's own testimony at the hearing largely mimicked what she had told Suarez about the events that caused her injury, although the robbery now did not involve her pocketbook but rather a gift bag that she had been carrying with the intention of presenting it at a birthday party that was being held in Cooper Park. Tr. 40-42. She said she did not see the person or persons who attacked her. Tr. 50. She denied that Matta had caused her injuries. Tr. 54. She testified that she did not recall what she had told the police at the hospital, or that she had written out the statement introduced by the government, but she did recall with specificity that she had been given morphine, demerol, and percocet before the officers arrived. Tr. 55. She confirmed that surgery was required to repair her broken jaw, including the insertion of two metal plates, and that she remained in the hospital for a number of days after she first visited the emergency room. Tr. 51-52.[3]

---

[3]The X-rays taken at Beth Israel disclose that Coakley's jaw was fractured in two places. GX 2, page 5 of 12 (top of page).

There is little doubt in my mind that the only truthful statements Coakley has made about the events that caused her injuries were those made at the hospital to medical personnel and to police officer Yakovlev. Those statements implicating Matta were repeated on multiple occasions, to multiple persons. Her later efforts to attribute those statements to some sort of drug-induced state are not supported by the evidence. The hospital records disclose that the first administration of medication did not occur until 17:15, or 5:15 p.m. GX 5, page 2 of 12 (under heading "Flowsheets," sub-heading "Medication Administration").[4] By that time, Coakley had already told the triage nurse Deborah Radigan that she knew who her assailant was, in contradiction to her testimony at the hearing, but did not want a police report made. GX 2, page 1 of 12 (under heading "Triage").[5] That statement was made at 14:15, or 2:15 p.m. Then, again before any medication was administered, at 16:30 (4:30 p.m.) she told Palwasha Mahir, a physician's assistant, that it was her daughter's father who punched her. GX 2, page 2 of 12 (under heading "History of Present Illness," sub-heading "Note"). She again made statements specifically identifying Matta as her assailant not only to officer Yakovlev at approximately 6:15 p.m., GX 2, page 5

---

[4] The entries under the heading "Flowsheets," subheading "Medication Administration," must be read in conjunction with the entries on page 3 of 12 under the heading "Orders," subheading "Medicine." Taken together, those entries reflect that 30 mg of Ketorolac, to be administered intramuscularly, were ordered by Physician's Assistant Palwasha Mahir at 4:21 p.m., and given by intramuscular injection by Registered Nurse Rose Quidilla at 5:15 p.m. Likewise, one tablet of Oxycodone (Percocet) to be administered orally was ordered by Mahir at 7:03 p.m., and given orally by Licensed Practical Nurse Delvern Job-Pinchback at 7:12 p.m.

[5] The identity of the person to whom the statement was made is indicated in the medical records by the abbreviation "DRAD" which follows the entry. A key that provides the full name of the person is found at page 9 of 12 of GX 2. That key also provides the full names of the persons making other entries in the medical records to which the court refers in this opinion.

of 12 (under heading "Progress Notes"), but also to Doctor Leo Menkes at 18:04 (6:04 p.m.), GX 2, page 6 of 12 (under heading "Physician"). As noted above, the only medication administered prior to the latter two statements was 30 mg of Ketorolac (Toradol) at 5:15 p.m.; there was no testimony or other evidence concerning the effect, if any, that Ketorolac may have on cognitive abilities. Contrary to her testimony, Coakley never received morphine or demerol that afternoon or evening, and the only time she received percocet was at 19:12 (7:12 p.m.), well after she had made all of the statements noted above identifying Matta as her assailant. GX 2, page 2 of 12 (under heading "Flowsheets," sub-heading "Medication Administration").[6]

There are other indications in the documents and medical records prepared while Coakley was at the hospital that she was fully cognitive. The information she provided on GX 1 concerning her and Matta's date of birth, her address, and her child's name was all proved accurate by other evidence at the hearing. *Compare* GX 1 *with* Tr. 29, 37-38 *and* GX 2500-KW-5. The statement Coakley herself wrote out and signed is entirely lucid. GX 7. The neurological examination conducted at about 4:37 p.m. found her "alert and oriented to person, place, and time. Sensory and motor functions are grossly intact. Speech is normal. Appearance and judgement [sic] seem appropriate for gender and age." GX 2, page 3 of 12 (under heading "Exam"). She denied having "slurred speech, vision changes." GX 2, page 2 of 12 (under heading "History of Present Illness," sub-heading "Note"). When a CT scan

---

[6]Although the defendant's counsel referred in closing argument to medication being administered at 5:45 p.m., the entry at 5:45 is a notation concerning Coakley's response to the medication administered earlier, not an administration of fresh medication.

was proposed, she refused because that required her to remove her hairpins and hair weave. The records note that she "was explained risks of refusing, verbalized understanding, has capacity to refuse." " GX 2, page 5 of 12 (under heading "Progress Notes").

There are a number of reasons to disbelieve Coakley's later statements and testimony disclaiming Matta's involvement in the assault. First, it is clear that from the outset she has wanted to protect Matta. She initially declined to identify Matta at the hospital, and stated repeatedly that she did not want the police involved. She thus had no incentive falsely to accuse him of the assault. But once she learned that the police had arrested Matta for the crime, that desire to protect him furnishes the explanation for why she changed her story about how her injuries occurred, not once but twice.

There are other indications in her various versions of events that demonstrate the falsity of the explanations about her injuries that she gave first to Detective Wieber, then to Probation Officer Suarez, and finally to the court at the hearing. For example, she testified that she had spoken to Matta on a number of occasions in September after the injury but before he was arrested. Tr. 56. She was very vague, however, about when she told him about the assault and robbery, and denied that she told him about it the first time she saw him after it occurred. Tr. 44. That alone, is incredible, but there is more. She eventually conceded that she did tell him about the supposed robbery at some later point. Tr. 45. She also said she spoke to Matta's mother about the supposed robbery in early September. Although she was again quite vague about when she told Matta about the supposed robbery, Tr. 45, she was adamant that she had not spoken to him at any time after he was arrested, Tr.

-7-

58, so any such conversation, if it actually had occurred, would have occurred before Matta was arrested. Yet when Detective Wieber called her on the day Matta was arrested, she made no mention of any robbery and assault. Tr. 19-30. Rather, she gave him a story about having been drinking and being bumped accidentally causing her to fall. Tr. 30. Nor did Matta make any mention of any such robbery and assault when he was interviewed by Wieber on that day. Indeed, he gave almost exactly the same story as Coakley gave. Tr. 27-29; GX 2500-KW-5. The only conclusion to be drawn is that Coakley's and Matta's statements to Wieber were pure fabrications cooked up between them in September before Matta's arrest once Matta learned that Coakley had told the police and hospital personnel about his assault on her.

Their effort to cover up Matta's assault in this clumsy manner also of course completely undermines Coakley's later statements to Probation Officer Suarez, and her testimony at the hearing, that her injuries were the result of an assault committed during a robbery. The manner in which Coakley testified only reinforces my conclusions about her lack of credibility during her testimony. Her demeanor appeared resentful. Her testimony was not open, but guarded, with pauses at times suggesting that her testimony was not the product of her memory about events that had actually occurred, but rather the product of fabrications that required thought to insure consistency. She also had the tendency to avert her eyes when providing answers to the questions posed by the government.

Given all of the above considerations, I have no difficulty concluding that Matta grabbed Coakley by the neck and struck her repeatedly on the evening of August 25, 2012 in

the vicinity of Cooper Park in Brooklyn, as Coakley disclosed to hospital personnel and Officer Yakovlev at Beth Israel Hospital on August 26, 2012.[7]

Charges One and Two, as set forth in the Violation of Supervised Release Report, both accuse the defendant of violating the mandatory condition of supervision that he not commit another federal, state or local crime. Charge One asserts that Matta violated that condition by committing the crime of assault, and Charge Two asserts that he did so by committing the crime of menacing. I find that Matta's actions in grabbing Coakley by the neck and striking her repeatedly on August 25, 2012 satisfy the elements of both of those crimes.

The New York Penal Law provides that "[a] person is guilty of assault in the third degree when . . . [w]ith intent to cause physical injury to another person, he causes such injury to such person or to a third person." N.Y. Penal Law § 120.00 (McKinney). There is no dispute that Coakley's broken jaw constitutes a physical injury, and Matta's act of striking her repeatedly on the jaw provides ample evidence of his intent to cause that injury.

As to menacing, the New York Penal Law provides that "[a] person is guilty of menacing in the third degree when, by physical menace, he or she intentionally places or attempts to place another person in fear of death, imminent serious physical injury or physical injury." N.Y. Penal Law § 120.15 (McKinney). The Penal Law does not appear to define the phrase "physical menace." A dictionary definition of "menace" is "A declaration

---

[7] Much of the evidence upon which the court relies is hearsay, of course, but the court is permitted to do so as the Federal Rules of Evidence do not apply to proceedings involving the granting or revoking of supervised release. Fed. R. Evid. 1101(d)(3).

or indication of hostile intention, or of a probable evil or catastrophe; a threat." Oxford English Dictionary (online), http://www.oed.com/view/Entry/116371#eid0. Thus, physical menace would require an indication of hostile intention or a threat by physical, as opposed to simply verbal, means. By that definition, Matta's act of grabbing Coakley by the throat, and certainly his acts of striking her, constituted physical menace. Those acts also constitute sufficient evidence that Coakley was in fear of physical injury at the time those acts were committed.

I thus conclude, by a preponderance of the evidence, that Matta has committed the violations of the conditions of supervised release that are charged in Charges One and Two.[8]

### *Charge Three: Use of Controlled Substances*

Charge Three, found in a Supplement to the Violation of Supervised Release Report, accuses Matta of violating the standard condition of supervision that he not purchase, possess, use, distribute or administer any controlled substance. On October 1, 2012, a urine specimen was obtained from Matta, and that specimen tested positive for the presence of cocaine. GX 4; Tr. 64.[9] Probation Officer Suarez spoke to Matta by telephone on October 5, 2012, shortly after he had been released from custody following his arrest, and he admitted

---

[8] The government's burden of proof with respect to violations of supervised release is to establish the violations by a preponderance of the evidence. *See* Fed. R. Crim. P. 32.1(d); 18 U.S.C. § 3583(e)(3). Had the burden of proof been higher, e.g., by clear and convincing evidence, I would still conclude readily that the government had met its burden.

[9] The transcript reflects testimony by Probation Officer Suarez that the specimen was obtained on September 1, 2012. Tr. 64. The document received in evidence as GX 4, however, reflects that the specimen was collected on October 1, 2012. The court concludes that the reference to September 1, 2012 in the transcript was a mistake made either by Suarez in her testimony or by the court reporter in recording it.

in that conversation that he had consumed cocaine for three days while in custody at Riker's Island. Matta does not contest the charge. T. 96. Accordingly, I conclude that the government has proved, by a preponderance of the evidence, that Matta has committed the violation charged in Charge Three.

## CONCLUSION

For the foregoing reasons, I recommend that the court find Matta guilty of committing the violations of which he is accused in Charges One, Two and Three in the Violation of Supervised Release Report and the Supplement thereto.[10]

\*	\*	\*	\*	\*	\*

Any objections to this Report and Recommendation must be submitted to Judge Irizarry within 14 days of receipt of this report. Failure to file objections within the specified time may constitute a waiver of the right to appeal any judgment or order entered by the District Court in reliance on this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b); *see, e.g., Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Mario v. P & C Food Markets, Inc.*, 313 F.3d 758, 766 (2d Cir. 2002); *IUE AFL-CIO Pension Fund v. Herrmann*, 9

---

[10]The government submitted evidence concerning telephonic conversations between Matta and others while he was in prison to demonstrate that he sought to construct an alibi defense to the charges. I make no findings as to the probative value of that evidence as it is unnecessary to the conclusions reached in this opinion. Similarly, after the hearing had closed, the government submitted a letter dated November 19, 2012 [DE 39] accompanied by additional evidence that was produced to the government after the hearing, and the defendant has opposed the submission [DE 40]. I have not considered that additional evidence in reaching my conclusions.

F.3d 1049, 1054 (2d Cir. 1993); *but cf. DeLeon v. Strack*, 23 F.3d 84, 86-87 (2d Cir. 2000); *United States v. Male Juvenile*, 121 F.3d 34, 37-39 (2d Cir. 2000).

**Respectfully recommended,**

*Viktor V. Pohorelsky*
VIKTOR V. POHORELSKY
United States Magistrate Judge

Dated:   Brooklyn, New York
         December 6, 2012